Bruce **FRANKS**, Jr, Respondent,

v.

Penny V. **HUBBARD**, Appellant.

No. ED 104797

Missouri Court of Appeals,
Eastern District,
**DIVISION FIVE.**

Filed: September 13, 2016

David Roland, Mexico, MO, for Plaintiff/Respondent.

Jane E. Dueker, Arthur D. Gregg, Michael J. Colona, St. Louis, MO, for Defendant/Appellant.

Roy L. Richter, Judge

## I. INTRODUCTION

This is an election contest[1] arising out of the August 2, 2016 Primary Election ("the Election") to nominate a Democratic candidate to serve the 78th State House District in the Missouri House of Representatives ("the 78th District"). Respondent Bruce Franks, Jr. ("Franks") contends that 246 absentee ballots were improperly accepted and counted by the City of Saint Louis Board of Election Commissioners ("the Board"). Appellant Penny V. Hubbard ("Hubbard") concedes 8 absentee ballots were unlawfully cast and should not count but she argues the other 238 votes were lawfully cast and properly accepted by the Board. The Secretary of the State certified the results of the Election on August 25, 2016, finding Hubbard won by a total vote of 2,203 to 2,113.

Franks filed a Petition for Election Contest alleging "irregularities of sufficient magnitude" to cast doubt on the validity of the Election. Franks further alleged the Board improperly counted a significant number of absentee ballots in the election. Franks requested the trial court to order the Board to hold a new primary election in the 78th State House District ("the 78th District"). The trial court granted Franks' request and ordered the Board to conduct a special election for the 78th District on September 16, 2016. Hubbard appeals the order and judgment. Because the statutes regarding the protocol for absentee voting

1. Brought under §§ 115.527 to 115.601, RSMo 2000.

are not ambiguous[2] and are mandatory under this Court's precedent we affirm the decision of the trial court.[3]

## II. FACTS AND PROCEDURAL BACKGROUND

### A. Election Results

On election day, Franks garnered 1,999 non-absentee votes and Hubbard received 1,787 votes. However, Hubbard collected a substantial percentage of absentee votes; Hubbard earned 416 absentee ballot votes, while Franks received 114 votes. Franks earned 212 more votes than Hubbard from non-absentee voters and Hubbard collected 302 more votes than Franks from absentee voters. Consequently, Hubbard prevailed in the primary race with a 90 vote margin of victory, tallying 2,203 votes compared to Franks' 2,113.

**Results of the August 2, 2016 Election**

| | **Hubbard** | **Franks** |
|---|---|---|
| **Non-absentee Votes at the Poll** | 1,787 (47.2%) | 1,999 (52.8%) |
| **Absentee Votes** | 416 (78.5%) | 114 (21.5%) |
| **Total Votes** | 2,203 (51.0%) | 2,113 (49.0%) |

### B. Contested Absentee Ballots

Franks initially contested the validity of 246 absentee votes the Board counted. The parties stipulated that 8 of those votes were unlawfully cast by people who did not live in the jurisdiction and should not have been counted. Accordingly, this dispute concerns the validity of 238 absentee votes. Franks contends that many of the 238 votes were unlawfully cast for different reasons. More specifically, Franks alleges there were *five groups of improperly counted absentee votes in violation of § 115.283*[4]:

1. Walk-in absentee votes not placed in executed ballot envelopes:

 142 of the absentee votes were cast at the central polling location of the Board and none of them were placed in an executed ballot envelope.

2. Ballot envelopes missing voter's written address underneath signature:

 57 absentee votes were cast without the voter writing their address underneath their signature on the ballot envelope.

3. Ballot envelopes missing assistant's signature:

 11 absentee voters received assistance completing their ballots and their assistant did not include a statement similar to the example provided in § 115.283.5, RSMo 2000.

4. Ballot envelopes missing voter's written address and signed affidavit:

 1 absentee voter did not include her full address on her absentee ballot envelope or include a statement similar to the example provided in

---

**2.** §§ 115.275 to 115.304, RSMo govern the procedures for absentee voting in Missouri.

**3.** Appellant's Motion to Strike was taken with case and is denied.

**4.** All references to § 115.283 are to RSMo Supp. 2013.

§ 115.283.5 from the person assisting her.

5. Ballot envelopes requiring notarization but that were not notarized:

The Board sent 27 absentee ballot envelopes to voters which stated no notarization was required. However, when these ballots were returned to the Board, the stated reason given on the absentee ballot envelopes required notarization.

### C. Trial Court's Findings and Conclusions

In its Memorandum, Order and Final Judgment ("Judgment"), the trial court found the Board "disregarded" the "tedious and specific statutory process" created by the Missouri legislature and stated the statutory provisions "must be specifically followed." Furthermore, the trial court was "firmly convinced" that the irregularities in the collection and acceptance of absentee ballots "affected the outcome of the election," and the irregularities were more than "petty procedural infirmities" that violate election law. Although, the trial court found that the number of votes in dispute was 238, the trial court concluded that 142 of those votes, in addition to the 8 votes the parties stipulated were improperly counted, "violated Missouri law" and exceeded the apparent margin of victory (90 votes). Accordingly, the trial court held that the irregularities were of "sufficient magnitude to cast doubt on the validity of the initial election," and it ordered the Board to conduct a "special election" for the District on Friday, September 16, 2016. Hubbard now appeals.

### III. STANDARD OF REVIEW

The trial court's order to hold a special election must be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declared or applied the law. Marre v. Reed, 775 S.W.2d 951, 954 (Mo. banc 1989). We review questions of law de novo. Garza v. Valley Crest Landscape Maint., Inc., 224 S.W.3d 61, 64 (Mo.App. E.D.2007). Statutory construction is considered a question of law. Id.

### IV. DISCUSSION

#### A. The Board's failure to require the use of absentee ballot envelopes for votes cast on electronic voting systems constituted an irregularity of sufficient magnitude to cast doubt on the validity of the Election.

##### i. Absentee voting law procedures are mandatory.

In her first point on appeal, Hubbard contends the trial court erred in ordering a new election pursuant to § 115.549, RSMo 2000 because the Board's failure to require the use of absentee ballot envelopes for absentee voting on electronic voting systems, even if deemed an irregularity, in the absence of fraud, was not of sufficient magnitude to cast doubt on the validity of the initial election. We disagree.

In Elliot v. Hogan, this Court held the strict procedures of absentee voting laws were mandatory. 315 S.W.2d 840, 848 (Mo. App.E.D.1958) ("Taking into account the purposes of the act, the nature of the safeguards provided, and the consequences which would result from non-compliance therewith, in our opinion the statutes are mandatory.") Under current Missouri law, § 115.283 lays out strict procedures for casting absentee votes. The statute requires absentee ballots cast in person or via mail be placed inside a pre-printed ballot envelope stating "the voter's name...voting address...mailing address,

and the voter's reason for voting an absentee ballot."[5]

Section 115.283 additionally requires every absentee voter to state under penalties of perjury that:

> The voter...is qualified to vote in the election, that the voter has not previously voted and will not vote again in the election, that the voter has personally marked the voter's ballot in secret or supervised the marking of the voter's ballot if the voter is unable to mark it, that the ballot has been placed in the ballot envelope and sealed by the voter or under the voter's supervision if the voter is unable to seal it, and that all information on the statement is true. In addition, any person providing assistance to the absentee voter shall include a statement on the envelope identifying the person providing assistance under penalties of perjury.

§ 115.283.1.

The voter is required by law to fill out this affidavit and have it notarized prior to casting it or delivering it to the election authority. The only exception to this rule is found in § 115.291: if the voter is voting absentee due to an incapacity or confinement, or because they are caring for such an individual, then they do not need to have their ballot envelope statement notarized.

A court may order a new primary election for a contested office if it "determines there were irregularities of sufficient magnitude to cast doubt on the validity of the initial election [.]" § 115.549, RSMo 2000. When interpreting the meaning of a statute its words are given their plain and ordinary meaning. Maudlin v. Lang, 867 S.W.2d 514, 516 (Mo.banc 1993). In Gerrard v. Bd. Of Election Comm'rs, this Court found the facts alleged a violation of an election statute, which rose to the level of an irregularity. 913 S.W.2d 88, 90 (Mo. App.E.D.1995). The Court held "[a]pplying the plain meaning of the word irregularity clearly would include disregarding a statute." Id. at 90.

Barks v. Turnbeau dealt with an abuse of absentee voting procedures. 573 S.W.2d 677, 678 (Mo.App.E.D.1978). Of 70 people who voted absentee, 66 of them failed to apply in writing for an absentee ballot as required by § 115.279 and § 115.289.[6] Id. at 680. However, the election authority issued these voters absentee ballots and permitted them to vote in violation of Missouri's absentee voting laws. Id. Additionally, the printed affidavits for all the absentee voters did not state the voter was obligated under penalty of perjury to declare the reason why they were voting absentee in violation of § 115.283.[7] Id. "Most of the absentee voters failed to personally fill out the affidavit on the ballot envelope, and 48 of the 70 failed to specify a reason for voting absentee in violation of... § 115.283.2 and § 115.291." Id. Out of 70 absentee voters, 66 did not return their ballots in a manner authorized by § 115.291.2. Id. Consequently, the election authority did not reject absentee ballots

---

5. Under § 115.294, RSMo 2000 the election authority cannot reject an absentee ballot that does not state the voter's reason for voting absentee (effective date 1989). This statute post-dates § 115.295, RSMo 2000 which states "if the statements on any ballot envelope have not been completed, the absentee ballot shall be rejected" (effective date 1983).

6. Section 115.279 requires applications for absentee ballots be made in writing. Section 115.289.1 requires the election authority to keep a list of "the name, voting address and mailing address" of every applicant for an absentee ballot.

7. The statute referenced here is to RSMo 1977.

containing faulty affidavits. *Id.*[8] As a result, the trial court found irregularities that were of sufficient magnitude to cast doubt on the validity of the election and ordered a new election. *Id.* at 678.

The appellant in *Barks* argued none of these procedural errors were the fault of the voters and the violations did not affect the actual tally, therefore the trial court erred in ordering a new election. *Id.* at 681. Our Court disagreed, stating "the opportunity to vote by absentee ballot is clearly a privilege and not a right. Compliance with the statutory requirements is mandatory." *Id.* This Court further held "[t]he legislature has provided safeguards to prevent abuse of the privilege, including a lengthy procedure of application and registration. Most importantly, the General Assembly has mandated that the effect of a faulty affidavit shall be the rejection of the ballot." *Id.* (citing § 115.295). We believe the same holds here because the 142 ballots cast in person, via electronic machines, were filed without their accompanying envelopes and affidavits as required by Missouri law.

Appellant argues in her brief that the violations at issue are technical, and not due to any error by the voters of the 78th District, and there is no evidence that any of the 142 in-person absentee ballots were cast for a candidate that was not the individual voter's choice. This Court acknowledged the general rule in cases dealing with ordering new elections is that "where an irregularity has...not...interfered with a full and fair expression of the vot-

ers' choice, particularly where it is the mistake of an election official, the irregularity should not result in the disenfranchisement of the voters." Elliott v. Hogan, 315 S.W.2d 840, 846 (Mo.App.1958). However, this Court has held that" [t]o vote by absentee ballot is not a matter of inherent right but rather a special privilege available only under certain conditions[.]" State ex rel. Bushmeyer v. Cahill, 575 S.W.2d 229, 234 (Mo.App.E.D.1978). Additionally, we have stated Missouri's absentee ballot requirements are mandatory and the Legislature "has provided safeguards to prevent an abuse of the privilege." Elliot, 315 S.W.2d at 878. This precedent is drawn directly from the Missouri Supreme Court which established that the casting of an absentee ballot is "a special privilege... available only under certain conditions" and "until these conditions are complied with, the privilege cannot be exercised." Straughan v. Meyers, 268 Mo. 580,187 S.W. 1159, 1164 (1916) (holding that absentee ballots should not have been counted where not accompanied by affidavits).[9]

### ii. An invalidly cast absentee ballot constitutes legal fraud.

The appellant in *Barks* argued "that the violations were solely procedural and did not demonstrate actual voter fraud[.]" *Id.* at 682. Hubbard similarly argues there was no evidence the absentee votes at issue in the present case were fraudulently cast. However, a failure to follow the specific requirements of absentee voting laws is enough to find legal fraud. *Id.* (citing Gantt v. Brown, 238 Mo.

---

8. Furthermore, the election authority did not record the receipt of sixty-six out of the seventy absentee ballots, making it impossible to determine whether these votes were cast by registered voters living in the district. *Id.* at 681.

9. *See* Matt Potter. *Confusion in Minnesota Senate Election: Could it Happen in Missouri?,*

65 J. Mo. B. 296, 304 (2009). ("Missouri absentee ballot protocol serves a very important purpose in quashing fraud and shenanigans that often accompany the electoral process, and voters should make every attempt to follow them to the letter to make certain their votes are counted.")

560, 142 S.W. 422, 425 (1911)); Elliott v. Hogan, 315 S.W.2d 840, 848 (Mo.App.E.D. 1958). The Missouri Supreme Court stated, "a person in good faith, and without intention to work a fraud upon any person, might cast a vote, and yet the vote would be illegal [due to a violation of the absentee voting statutes]. Gantt, 142 S.W. at 424. Such a vote in law works a fraud upon the person against whom it is cast, and would be denominated a legal fraud[.]" Id. "Whether the fraud alleged in an election contest be actual or legal is immaterial[.]" Elliott, 315 S.W.2d at 849; see also Gantt, 142 S.W. at 425. What a court must determine is whether "the absentee voting irregularities were 'of sufficient magnitude to cast doubt on the validity of the initial election.'" Barks, 573 S.W.2d at 682 (citing § 115.549).

In the present case, the trial court held "[t]he Election Board disregarded the statutes related to absentee voting by failing to require 142 absentee voters to use envelopes as provided by Missouri law. This disregard of the relevant statutes constitutes an irregularity." Furthermore, the trial court was "firmly convinced that these irregularities affected the outcome of the election," noting that these irregularities were "more than 'petty procedural infirmities but abuses of the election law which cannot be ignored.'" (citing Barks, 573 S.W.2d at 682). The trial court held the number of votes at issue exceeded the margin of Hubbard's victory and was of sufficient magnitude to cast doubt on the validity of the primary election. The trial court concluded that the use of envelopes in absentee voting ensures a fair vote, a fair count of the ballots, and "the ability to challenge absentee ballots, as provided by Section 115.303."

**iii. There is a legal difference between an absentee ballot application and a sworn statement on the envelope of a cast absentee ballot.**

In her brief, Hubbard argues the trial testimony showed that poll workers at the central location used ballot applications of in-person voters in lieu of the ballot envelopes and that the difference between the two is "a distinction without a legal difference." We disagree.

Evidence at trial demonstrated the application for an absentee ballot is not notarized, does not indicate a person is signing under penalty of perjury and is not labeled as an affidavit. However, the statement on a ballot envelope is an affidavit, made under penalty of perjury, and required to be notarized unless the person is voting absentee due to their incapacity or care of another who is incapacitated. Additionally, the application does not use the statutory language from § 115.283.1 which provides, in great detail, the requirements of the ballot envelope.

Section 115.283.1 requires the following statement for anyone voting absentee to "be in substantially the following form:"

I hereby state under penalties of perjury that I own property in the ........ district and am qualified to vote at this election; I have not voted and will not vote other than by this ballot at this election. I further state that I marked the enclosed ballot in secret or that I am blind, unable to read and write English, or physically incapable of marking the ballot, and the person of my choosing indicated below marked the ballot at my direction; all of the information on this statement is, to the best of my knowledge and belief, true.

In contrast, the language on the application form used by the Election Board states:

Penalty for violation: Any person who knowingly makes, delivers or mails a

fraudulent absentee ballot application shall be guilty of a Class One Election offense punishable, upon conviction, by imprisonment of up to 5 years and/or a fine of no less than $2,500.

The evidence at trial does not support the conclusion that the application's warning that making a false statement on the application can subject the signer to criminal penalties is substantially equivalent to the voter making a sworn statement, notarized by a notary public, that they are lawfully casting their vote under Chapter 115. The intent behind each is significantly different; in applying to vote by absentee ballot, the applicant is stating they understand the penalty for making a fraudulent application is a Class One Election offense. Whereas, on an absentee ballot, the signor is making a covenant that they have lawfully cast their vote, the information included within their ballot envelope is true, and they will not cast another vote in the same election. We find there is a significant legal distinction between the voters' notarized sworn statement on an absentee ballot envelope and their signature on the application for an absentee ballot.

### iv. Missouri Courts distinguish between absentee voting errors and other election errors.

Hubbard's argument that the holding of Royster v. Rizzo, demonstrates the vote should not be overturned is unpersuasive. 326 S.W.3d 104 (Mo.App.W.D.2010). Royster is distinguishable from the present case because the irregularities at issue were not absentee voting requirements but a plethora of alleged violations that occurred at a polling location on election day. Id. at 107. In Royster, the trial court held the alleged irregularities were not of sufficient magnitude to warrant a new election under Chapter 115. The Court of Appeals affirmed, noting appellant failed to demonstrate the trial court erred in finding the

alleged irregularities were insufficient to warrant a new election. Id. at 115. These alleged irregularities were that "non-English speaking voters were improperly assisted or instructed on how to vote at two polling locations, that improper electioneering occurred at one polling location, that certain precincts were improperly consolidated into a single polling place, and that other voting formalities required by state law were not followed during the election." Id. at 107. The Western District distinguished Royster from Barks and Elliot, stating "in both cases the [Eastern District] affirmed the finding of the trial court that the election in question was plagued by the failure to follow the applicable election laws [on absentee voter protocol]." Id. at 115. The court held the appellant's argument "highlights the deference we owe to the trial court in making this ultimate finding" of whether the irregularities in question are or are not of a sufficient magnitude to warrant ordering a new election. Id.

### v. The Board failed to follow absentee voting procedures as required by Missouri law.

█ Joan Burger ("the Chair"), the chair of the Board at the time of the Election, testified that Missouri law required the use of envelopes for every absentee ballot and stated that the Board did not use the envelopes as required by the statute. She additionally testified that after a ballot is cast in person at the Board's office there is no way to connect the vote to the person who cast it, effectively preventing a successful challenge of any illegally cast absentee votes. The Board does not hold aside in-person absentee ballots cast electronically with paper absentee ballots that are to be opened and counted on election day by specially appointed teams with an equal number of judges from each

major political party, as required by § 115.299. RSMo 2013.

This testimony was corroborated by the testimony of Pamela Lake, the Democratic Absentee Supervisor Coordinator ("Absentee Supervisor"), an employee of the Board who was familiar with the day to day operation of the St. Louis Election Commission and the protocol used to accept and count absentee votes in the 78th District. She stated under the Board's current procedures, an absentee vote, whether cast electronically or by paper, cannot be connected back to the person who voted after it is filed by the Absentee Supervisor into the Board's system. This Court has held the requirements of the absentee voting laws are mandatory and must be followed to preserve the integrity of the vote. *See* Elliott v. Hogan, 315 S.W.2d 840, 848 (Mo. App.1958); Barks v. Turnbeau, 573 S.W.2d 677, 681 (Mo.App.E.D.1978), *see also* Gasconade R–III Sch. Dist. v. Williams, 641 S.W.2d 444, 445 (Mo.App.E.D.1982).

In the instant case, the evidence at trial revealed numerous violations of the absentee voter statutes. The most serious was the failure of 142 in-person absentee voters to complete an affidavit swearing the information on their ballot was true and have this statement notarized as required by state law. Additionally, 57 absentee votes were cast without the voters writing their address on the ballot envelope as required by § 115.283.1. A third violation occurred when the Board accepted 11 absentee ballots from voters who received assistance filing out their absentee ballot but their assistant did not sign a statement under penalty of perjury or notarize these ballot envelopes as required by

§ 115.283.5. One absentee voter did not include her full address on the absentee ballot envelope or include a statement from the person assisting her with her ballot.

There were 21 voters who requested ballots due to their incapacity and were duly sent envelopes stating "no notary required." However, when returning the envelopes these same voters used a different reason for voting absentee, one that would require their ballot envelopes be notarized. The Absentee Supervisor stated at trial these ballots were accepted because it was their policy to go by the statements made on the absentee applications when the affidavit and application conflict. The Board made a similar error in accepting the un-notarized ballots of 6 voters who were required to have their absentee ballots notarized, but they received envelopes from the Board stating no notarization was required. The Absentee Supervisor testified these un-notarized ballots were accepted due to "human error."[10]

### vi. A new election will not violate the Voting Rights Act, the Missouri Constitution, or the U.S. Constitution.

 Hubbard also contends in her brief that ordering the Board to hold a new election violates the Voting Rights Act, the U.S. Constitution, and the Missouri Supreme Court, because a new election would effectively "invalidat[e] the votes of 4,316 qualified and registered voters." We disagree. The trial court's order of a special election does not violate the Voting Rights Act of 1965, 52 U.S.C. § 10101. Section 10101 is meant to protect an individual's *right* to vote. Ordering a special election to replace the results of the original, improp-

10. A review of the ballots entered into evidence at trial shows the Board rejected 14 ballots for lack of notarization. The Supervisor Coordinator testified the Board does not notify the voter when they reject their absentee ballot. A review of Exhibit 13 demonstrates that one of the 14 ballots rejected for lack of notarization was not required to be notarized.

erly conducted election does not prevent qualified voters from casting a vote. Every qualified voter will still retain his or her right to vote in the special election. Implementing procedures to safeguard against fraud helps ensure that qualified registered voters' votes are not diluted by unlawful voter activity. These procedures, such as calling for a new election, effectively *protect* voters' rights, not *abridge* them.

Similarly, the U.S. Constitution and Missouri Constitution grant qualified voters a constitutional *right* to vote. Here, no person's constitutional right to vote is being infringed upon. Under the Missouri Constitution, the right to vote by absentee ballot is "clearly a *privilege* and not a right." Barks, 573 S.W.2d at 681 (emphasis added). Under the U.S. Constitution, the "fundamental right to vote" is different from a "claimed right to receive [an] absentee ballot[ ]." McDonald v. Board of Election Comm'rs of Chicago, 394 U.S. 802, 807, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *see also* Griffin v. Roupas, 385 F.3d 1128, 1130 (7th Cir.2004) (stating that the U.S. Constitution does not require states to allow voters to vote by absentee ballot, and it gives states broad authority to regulate the conduct of elections).

In light of these circumstances, the trial court had substantial evidence before it to find the election board's failure to use ballot envelopes was an irregularity and that it was of sufficient magnitude to affect the outcome of the election. The trial court did not erroneously declare or apply the law in ordering a new election.

## B. Missouri's laws and regulations require the Board to follow the requirements for absentee voting procedure as laid out in Chapter 115.

In her second point Hubbard contends the trial court erred in ordering a new election pursuant to § 115.549, RSMo 2000 because the election board's use of electronic voting systems for in person absentee voting, in lieu of mandating the use of absentee ballot envelopes, is authorized by Missouri law and does not constitute an "irregularity" justifying a new election. We disagree.

### i. The regulations promulgated by the Secretary of State do not conflict with the requirements of Chapter 115.

Pursuant to § 115.225.3:

The Secretary of State shall promulgate rules and regulations to allow the use of a computerized voting system. The procedures shall provide for the use of a computerized voting system with the ability to provide a paper audit trail. Notwithstanding any provisions of this chapter to the contrary, such a system may allow for the storage of processed ballot materials in an electronic form.

The Secretary of State promulgated a regulation setting out the procedures for absentee voters which permits the use of electronic voting. 15 C.S.R. 30-10.080.1 states "All jurisdictions using electronic data processing tabulation systems may conduct absentee balloting by the same means. *The requirements of Chapter 115, RSMo shall be followed.*" (emphasis added). Nonetheless, we do not find 15 CSR 30–10.080 and § 115.225 inconsistent with any of the Absentee Voting statutes (§§ 115.275 to 115.304).[11] Rather, we find the Automated Voting Equipment statutes (§§ 115.225 to 115.273) do not address absentee voting, making 15 CSR 30–10.080 and § 115.225 wholly inapplicable to the present case. This reading of the statute is supported by § 115.007, RSMo. Supp. 2013, which states, "No part of sections 115.001 to 115.801 shall be construed as

---

**11.** All references to § 115.225 are to RSMo Supp. 2006.

impliedly amended or repealed by subsequent legislation if such construction can be reasonably avoided." (emphasis added). Our interpretation that § 115.225 is consistent with the Absentee Voting statutes is reasonable here. In interpreting a statute or regulation we look at the plain and ordinary meaning of the words used. Maudlin v. Lang, 867 S.W.2d 514, 516 (Mo. banc 1993); Dep't of Soc. Servs., Div. of Med. Servs. v. Senior Citizens Nursing Home Dist. of Ray Cty., 224 S.W.3d 1,10 (Mo.App.W.D.2007) ("The same principles of construction are used in interpreting regulations as in interpreting statutes.") Here, the only reasonable interpretation of C.S.R. 30-10.080 is that the requirements of §§ 115.283, 115.294, and all the other absentee voting protocols must be followed without exception. Hubbard argues in her brief that the Board has permitted in-person absentee voters to cast their ballots using electronic devices for ten years, but doing something not permitted by law for a long period of time does not cause it to become permissible.

### ii. The trial court did not issue a declaratory judgment.

Alternatively, Hubbard argues that the trial court exceeded its authority and issued a declaratory judgment on the validity of a state regulation within the context of an election contest. This argument is without merit. "A 'declaratory judgment' declares the rights of the parties or expresses the opinion of the court on a question of law *without ordering anything to be done.*" 26 C.J.S. Declaratory Judgments

§ 1 (emphasis added). A declaratory judgment is distinguishable from other actions because it does not "seek execution or performance from the opposing party." *Id.* Here, the trial court discusses Hubbard's reliance on 15 CSR 30-10.080. However, the trial court's reasoning that a regulation cannot expand or modify a statute does not impact the outcome of this case or grant Franks any relief. As discussed *supra*, the regulation does not conflict with the Absentee Voting statutes. The trial court's Judgment does not simply express an opinion on a question of law; it orders the Board to conduct a special election for the 78th district. Accordingly, the trial court did not grant a declaratory judgment regarding the validity of 15 CSR 30-10.080 within the context of an election contest, and the appellant's point is denied.[12]

## V. CONCLUSION

There was substantial evidence to support the trial court's decision, it was not against the weight of the evidence, and the court did not erroneously declare or apply the law. The judgment is affirmed.

Philip M. Hess, C.J., concurs.

Colleen Dolan, J., concurs.

---

12. This Court is mindful of the Fourth Circuit Court of Appeal's decision holding that the Americans with Disabilities Act and federal regulations required access to electronic voting to avoid discrimination of disabled persons in Maryland. *See* Nat'l Fed. of the Blind, et al. v. Lamone, et al., 813 F.3d 494, 505–506 (4th Cir.2016). The parties did not brief the issue of whether or not federal law requires the disabled have access to touch-screens when voting absentee. Therefore we decline to address this issue. However, nothing in this opinion should be construed to prevent election authorities from complying with federal law.